# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3972

_____

Betty A. Simpson,               *
                                   *

       Appellee,          *
                                   *   Appeal from the United States

v.                     *   District Court for the Eastern
                                   *   District of Arkansas

Merchants & Planters Bank,   *
                                   *

       Appellant.        *

_____

Submitted: October 14, 2005
Filed:  March 20, 2006

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

BEAM, Circuit Judge.

The primary question for this court is whether to reverse a jury's finding of a willful violation of the Equal Pay Act.  29 U.S.C. § 206(d).  Finding sufficient evidence to allow a reasonable jury to find such violation, we affirm.[1]

_____

[1]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

## I. BACKGROUND

Because Merchants & Planters Bank appeals the district court's denial of a motion for judgment as a matter of law, we "assume as proven all facts the nonmoving party's evidence tended to show, resolve all conflicts in favor of the nonmoving party, and draw all reasonable inferences in favor of the nonmoving party." Jones v. Fitzgerald, 285 F.3d 705, 712 (8th Cir. 2002).

Merchants & Planters Bank was founded in 1890 in Clarendon, Arkansas. In late 2000, the Bank named J. Baxter Sharp, III, the co-chairman of its Board. He served in that capacity until 2001, when he became the chair. Sharp has also served as the Bank's counsel since 1992, a role which included policy development. The Bank's Personnel Policy provided for an annual evaluation for each employee.

Betty Simpson was hired by the Bank in 1977, and worked there until 2002. After leaving the Bank, Simpson sued the Bank for violating the Equal Pay Act. 29 U.S.C. § 206(d). Simpson alleged that she was paid less than J. Kendall Henry, a male co-worker, and that his job was equal to hers. In order "[t]o recover under the Equal Pay Act, [Simpson] must prove that [the Bank] discriminated on the basis of sex by paying different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" Tenkku v. Normandy Bank, 348 F.3d 737, 740 (8th Cir. 2003) (quoting 29 U.S.C. § 206(d)(1)).

Simpson began working as a teller on October 27, 1977. Approximately one year later, she moved to the loan department as its sole employee. She became assistant cashier and loan officer in 1982. According to the complaint Simpson filed with the Equal Employment Opportunity Commission (EEOC), when Simpson had replaced a male employee, she earned several thousand dollars less than the male predecessor in the same position.

By March of 1989, Simpson had become an Assistant Vice President. In this capacity, Simpson provided Federal Deposit Insurance Corporation (FDIC) and Arkansas State Bank required reports to the Board. She also created a spreadsheet, writing macros that would automatically produce six pages of calculations, to recreate a Board report derived from a national bankers' meeting. Simpson was responsible for determining the Bank's annual income and the Bank's shareholders' dividends. In 1991, Simpson learned how the Bank's accountants performed the conversion to cash, which resulted in a ten thousand dollar savings to the Bank that year. This cost-savings process was performed by Simpson annually thereafter. Simpson also saved the Bank thirteen thousand dollars one year by inventorying the Bank's commercial property and ensuring that the Bank was not taxed on property it no longer owned.

Simpson completed numerous reports to governmental agencies, none of which was ever rejected. Simpson compiled a monthly voluntary self-audit for the Arkansas State Bank. She produced the call report, a thirty-six page report to the FDIC, requiring the signature of the President and three Board members. Her work was only reviewed by the Board of Directors for the Bank and was never rejected by them. No one directly supervised Simpson, and even the Senior Vice President and Cashier could not answer questions about the call report. Simpson consulted and interpreted the FDIC regulations independently. Bonds provided the majority of the Bank's income, and Simpson was responsible for calculating the advantage in purchasing bonds at a discount or premium and the tax ramifications of the Bank's bond holdings. The President often asked Simpson her opinion on which bonds to purchase.

Simpson served as duty officer every fourth week. The duty officer had to close the Bank and set the alarms. This position rotated among Henry, Simpson, and two other employees. When Estelle Catlett, the Senior Vice President and Cashier, was on vacation or sick, Simpson performed her duties, including payroll and error reconciliation. Simpson also supervised all employees at the Bank, except the

President and Vice President, during Catlett's daily lunch break and while Catlett was on vacation or sick.

All of the skills needed to do every job at the Bank were on-the-job acquired. During her time at the Bank, Simpson successfully completed a management school program at the University of Arkansas; the Arkansas Bankers Association's Lending, Marketing, and Management Schools; the Mid South School of Banking, Memphis State University; and investment seminars provided by First Tennessee Bank. In 1997, Simpson attended one computer school in South Dakota and another one in St. Louis. Simpson also publicly represented the Bank, including meeting with Senator Marion Berry, teaching a checkbook class, organizing a batting helmet drive for Mothers for Safer Little League, and serving on the Operations Committee for the Arkansas Bankers Association. In response to Simpson's 2002 EEOC complaint, the Bank reported that Simpson's duties were preparing monthly self-exam and quarterly reports, booking income and expenses, back-up bookkeeping, serving as security officer, issuing corporate shares and dividend checks, and providing investment information for monthly Board reports.

Simpson's sole written evaluation, for 1980, contained seven categories. Simpson received the highest possible score in six categories, and the next-highest score in the remaining category. The previous year, she had received a nine hundred dollar per annum raise. Simpson also performed work outside of regular hours, including at her house, and once even while she was in the hospital.

At trial, Simpson compared her position with a male employee, J. Kendall Henry. Henry was hired by the Bank in 1982. While working at the Bank, he completed a degree in finance at the University of Arkansas, Fayetteville. He attended the Mid South School of Banking, Memphis State University; the Arkansas Bankers Association's Basic/Intermediate, Audit, Lending, Marketing, and Management Schools; and the Dale Carnegie Course. Henry attended one of the two computer

training programs that Simpson had attended. Henry represented the Bank by helping another bank with its compliance program and by serving with the Young Bankers. The Bank's 2002 EEOC response explained that Henry worked after hours and on weekends. It also stated that Henry's jobs were information system coordinator, loan review officer, bank secrecy act officer, part-time teller, and loan department associate. However, as of 1998, another employee had taken over as bank secrecy act officer. In addition, Henry performed the Bank's internal audits.

Henry received a written evaluation in 1996, which contained thirty-one categories. He received top marks in twenty-two categories and the next-highest score in the other nine categories. In 1996, the Bank's President requested that Henry receive a ten thousand dollar per annum raise, because he would graduate from the Mid South School of Banking the following year and had been trained to operate the computers which would be delivered the following year. Henry's salary exceeded Simpson's in 1996. At that time, he was an untitled bank officer and she was Assistant Vice President, and the computers had not yet been installed. Henry was promoted to Vice President in February 1997, and received approximately $7,000 more in salary that year than did Simpson. Henry did not graduate from the Mid South School of Banking until 1998.

In addition to the comparison between Henry's salary and Simpson's salary, Simpson introduced other evidence. The Bank's personnel policy treated male and female employees differently. For example, the policy addressed the scheduling problems for "ladies . . . with children going to school" and stated that sick leave could not be taken for maternity leave. A former Bank employee testified that the Bank President had said, I wish "the bitch would quit," when told that Simpson was absent from work.

At trial, Simpson offered further examples of inequitable treatment she received. Simpson made suggestions to the Bank President about putting in a wide-

angle camera and new lighting in the drive-in for better security. He dismissed her ideas, but adopted them a year later when suggested by Henry. Henry was given greater latitude with working hours and often left work without telling anyone; in contrast, Simpson had to ask permission to leave and was twice denied permission to attend meetings required for re-qualification as the security officer. On December 31, 1999, Henry left at ten o'clock in the morning to be at a sporting event the following day, telling the employees who were finishing the year-end balancing to call a computer support company in South Dakota. Rheta Griffith, the Executive Vice President and a member of the Board, admitted that she had probably said a man was needed at the Bank, because so few men worked there. Finally, Simpson testified that Griffith had told her that men in Clarendon need to be paid more than women.

The jury returned a verdict in favor Simpson on her Equal Pay Claim, finding that (1) Simpson and Henry were employed by Merchants & Planters Bank in jobs requiring substantially equal skill, effort and responsibility, (2) the two jobs were performed under similar working conditions, (3) Simpson was paid a lower wage than a member of the opposite sex doing equal work, (4) the difference in pay was not the result of factors other than sex, (5) the amount of Simpson's damages was $35,664.37, and (6) Merchants & Planters Bank's conduct with respect to Simpson's pay was willful. The Bank appeals.

## II.    DISCUSSION

### A.    Prima Facie Case of Wage Discrimination

We review de novo the district court's denial of judgment as a matter of law, which should be granted if there is not sufficient evidence to support the jury's verdict, viewing all evidence in the light most favorable to the verdict. Jones, 285 F.3d at 712.

The Bank argues that Simpson's and Henry's jobs are not the same; therefore, they are not equal. Much of the precedent regarding unequal jobs involves comparing two jobs with a common core of duties, but with the higher-paid job having additional duties. See, e.g., Horn v. Univ. of Minn., 362 F.3d 1042, 1045-46 (8th Cir. 2004) (finding that the jobs of two hockey coaches were not equal because the female hockey coach served as a public representative to the hockey team, in addition to the administrative duties she had in common with the male hockey coach), McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 513-14 (8th Cir. 1995) (finding two jobs not equal because male employee performed other tasks in addition to the tasks female employee had previously performed), Krenik v. County of Le Sueur, 47 F.3d 953, 961 (8th Cir. 1995) (holding two maintenance employees' jobs not equal where male maintenance engineer had supervisory duties in addition to the job functions that female assistant performed). Simpson did not attempt to prove that she and Henry had the same job and that he had no additional duties. She attempted to prove the jobs were equal, which is the relevant inquiry.

We have previously determined that "jobs need not be identical to be considered 'equal' under the EPA; they need only be substantially equal." Hunt v. Neb. Pub. Power Dist., 282 F.3d 1021, 1029 (8th Cir. 2002). The inquiry as to whether two jobs are equal is a factual one:

> Whether two jobs entail equal skill, equal effort, or equal responsibility requires a practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job. Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job. In all cases, therefore, a court must compare the jobs in question in light of the full factual situation and the broad remedial purpose of the statute.

EEOC v. Universal Underwriters Ins. Co., 653 F.2d 1243, 1245 (8th Cir. 1981) (citing 29 C.F.R. §§ 800.114-.132). Thus, whether Simpson and Henry had equal jobs is a factual inquiry, dependent on their job requirements, not their job titles, and anchored around skill, effort, and responsibility.

In evaluating the first factor, the skill required to perform the jobs, a reasonable jury could have concluded that Simpson and Henry possessed the same experience, training, education, and ability to perform their jobs. Simpson had worked at the Bank longer and, thus, had more practical experience. The two had attended the same banking schools and computer training. Further, Simpson's sole written evaluation was as positive as Henry's written performance evaluation, so their abilities were the same. Henry's college degree is not relevant to determining the skill required to perform the jobs, since all the skills needed at the Bank were on-the-job acquired. See Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1533 (11th Cir. 1992) (explaining that in establishing a prima facie case under the Equal Pay Act, "only the skills and qualifications actually needed to perform the jobs are considered").

Likewise, on the second factor, effort, a reasonable jury could have determined that Simpson's and Henry's jobs required the same effort. Both were required to apply the same base of banking knowledge to their jobs. Further, both were required to work after-hours and both represented the Bank at public functions.

Finally, a reasonable jury could have determined that Simpson's and Henry's jobs required the same responsibility. Simpson's degree of accountability was very high. She prepared reports which were signed by Board members and submitted to federal and state agencies, including a voluntary self-audit. She had to interpret FDIC regulations, and no one checked her work. Henry's degree of accountability was similar, because he performed the Bank's internal audits.

Therefore, a reasonable jury could have determined that Simpson was paid less than Henry "for equal work on jobs the performance of which requires equal skill, effort, and responsibility."  29 U.S.C. § 206(d)(1).

### B.   Bank's Affirmative Defense – Pay Differential Based on Factors other than Sex

As an affirmative defense, the Bank asserts that it proved that the pay differential between Simpson and Henry was based on factors other than sex: Henry's college degree, work after hours and on weekends for the computer system, activity in the community, and efforts by other Banks to recruit Henry.  The jury rejected the Bank's contention, so we will disturb the verdict only if no reasonable jury could have returned a verdict for the non-moving party, viewing all evidence in the light most favorable to the verdict. Jones, 285 F.3d at 712.  "'Under the EPA, a defendant cannot escape liability merely by articulating a legitimate non-discriminatory reason for the employment action.  Rather, the defendant must prove that the pay differential was based on a factor other than sex.'" Lawrence v. CNF Transp., Inc., 340 F.3d 486, 493 (8th Cir. 2003) (quoting Taylor v. White, 321 F.3d 710, 716 (8th Cir. 2003)).

A reasonable jury could have rejected Henry's college degree as a reason for the pay differential, since all the skills needed at the Bank were on-the-job acquired. See, Miranda, 975 F.2d at 1533 (11th Cir. 1992) ("only the skills and qualifications actually needed to perform the jobs are considered").  The after-hours work could also have been rejected, since Simpson worked late as well, even while in the hospital.  The jury may have also rejected the Bank's reasoning that Henry's computer support justified his greater pay, since Simpson had received more computer training and Henry's pay exceeded Simpson's before the computers were installed.  Though Henry was active in the community, Simpson was also active in the community and represented the Bank in at least one meeting with a Senator.  Finally, while Henry may have been recruited by other Banks, the jury may have found that the recruitment did

not excuse the Bank's duty to pay Simpson on an equal basis. Exterior salary pressures have been rejected as reasons for pay differential by other circuits, and the jury here was not unreasonable in doing so also. See Irby v. Bittick, 44 F.3d 949, 955 (11th Cir. 1995) ("if prior salary alone were a justification, the exception would swallow up the rule and inequality in pay among genders would be perpetuated" (quotation omitted)).

### C.    Willfulness and the Award of Liquidated Damages

The jury determined that the Bank's actions were willful. The district court used this finding to award liquidated damages to Simpson. The Bank contends that this was error because (1) there was insufficient evidence at trial to support the verdict of willfulness and (2) the Bank established that it had acted in good faith and had reasonable grounds for believing that it was not violating the Equal Pay Act.

The Equal Pay Act's penalties include liquidated damages in an amount equal to actual damages. 29 U.S.C. § 216(b). However, an employer can avoid paying some or all of these liquidated damages if it can prove that it acted in good faith. Jarrett v. ERC Props., Inc., 211 F.3d 1078, 1083 (8th Cir. 2000) (citing 29 U.S.C. § 260). In addition, if an employee can show that the employer willfully violated the Equal Pay Act, the statute of limitations is three years, rather than the presumptive two-year statute of limitations, which could lengthen the time period for which damages can be awarded. 29 U.S.C. § 255(a). A finding of willfulness requires behavior on the part of the employer that exceeds negligence; the employer must act knowingly or with reckless disregard of whether the contested conduct was prohibited. See EEOC v. Cherry-Burrell, Inc., 35 F.3d 356, 364 (8th Cir. 1994) (citing McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988)).

At trial, Simpson introduced evidence that a reasonable jury could have used to support its finding that the Bank knew or showed reckless disregard for the fact that

-10-

its conduct was prohibited by the Equal Pay Act. First, Sharp, the Bank's counsel, was on the Board, which decided the salary of each employee. A reasonable jury could have concluded that Sharp, as an attorney, would been aware of the Equal Pay Act. Mere awareness of this law, standing alone, would not have been a willful violation of the Equal Pay Act. Id.

However, Simpson introduced other circumstantial evidence, which would enable a reasonable jury to determine that the Bank's violation of the Equal Pay Act was willful. Sharp was responsible for the Bank's personnel policy, which treated situations for male and female employees differently. In addition, the Executive Vice President, another Board member, said men were needed at the Bank and that men in Clarendon needed to be paid more than women. Viewing all the evidence in the light most favorable to the jury's finding, we conclude that a reasonable jury could have found that the Bank committed a willful violation of the Equal Pay Act.

The Bank failed to meet its burden of proving a good faith defense, particularly since Simpson proved willfulness. Jarrett, 211 F.3d at 1084 (noting employer's difficulty in mounting a good-faith defense where the same employer was found to have willfully violated provisions of the Fair Labor Standards Act). Therefore, we affirm the district court's award of liquidated damages.[2]

**D.    Attorney's Fees**

The Bank argues that the district court abused its discretion in not further reducing the amount of attorney's fees awarded to Simpson. The Supreme Court has

---

[2]The Bank points out that the district court did not use the willfulness finding to extend the ordinary two-year statute of limitations to three years, as provided by 29 U.S.C. § 255(a). This issue was not fully briefed by the parties and the amount of damages, and the issue of whether the correct statute of limitations was imposed, is not properly before us.

provided guidelines for determining the amount of attorney's fees where Congress has authorized awarding them to a prevailing party. Hensley v. Eckerhart, 461 U.S. 424 (1983). First, the district court should determine "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Id. at 433. If the prevailing party did not achieve success on all claims, this fee may be reduced, taking into account the most critical factor, "the degree of success obtained," with discretion residing in the district court. Id. at 436-37.

The Bank does not contest the district court's initial calculation of a reasonable fee, but argues that the twenty-percent reduction was inappropriate because the relief sought was much larger than the results obtained. The Bank suggests that the percentage of attorney's fees awarded should reflect the percentage of relief obtained versus that sought. We disagree. Though we have imposed a pro rata reduction in one extreme instance, where the attorney had unreasonably run up $488,960.25 in fees in comparison to $20,832 in compensatory damages requested in closing arguments, we were sure to emphasize that a pro rata reduction would not normally be appropriate. Gumbhir v. Curators of the Univ. of Mo., 157 F.3d 1141, 1146-47 (8th Cir. 1998). We have, indeed, explicitly rejected a "rule of proportionality" in civil rights cases because tying the attorney's fees to the amount awarded would discourage litigants with small amounts of damages from pursuing a civil rights claim in court. Jackson v. Crews, 873 F.2d 1105, 1110 (8th Cir. 1989).

We review the district court's award of attorney's fees for abuse of discretion. Hensley, 461 U.S. at 437. Most of the other claims that Simpson brought were either voluntarily dismissed or were disposed of on summary judgment. The claims that proceeded to trial were for constructive discharge (based on sex and based on disability) and for Equal Pay Act violations. We cannot say that the twenty-percent reduction was an abuse of discretion, and we therefore, affirm.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of judgment as a matter of law and its award of liquidated damages and attorney's fees.

_____